Mr. Davis, when you're ready. Your Honors, may it please the Court, my name is Timothy Davis. I represent Mr. Erwin Tobar-Barrera. This is an immigration case. Mr. Barrera started his immigration odyssey over 23 years ago. And before we get too far into it, I raised two arguments in my opening brief. One of them, this Court asked, well actually for the entire brief, this Court asked for a supplemental brief on the effect of Mondragon on my client's case. I candidly admitted that the Mondragon case completely wiped out my second argument. Is the petition for re-hearing still pending in that case? You mean for the case that Mr. Robbins pointed out, the Carrasco-Chavez case? No, I thought there was a petition, a long pending petition for pen bank re-hearing in Mondragon. But maybe I'm wrong. No, actually, Your Honor, I talked to the Mondragon attorneys and that was a very sympathetic case, Your Honor. We're talking about a very minor crime that through the bizarre working of the felony and I don't want you to waste your time talking about it. They resolved that case because the government offered them a settlement, which they greedily accepted in that case, Your Honor. So that case was not, that case, they dropped that bond. But however, there is another case. They dismissed the petition for a re-hearing? I believe so, Your Honor. I don't want you to take your time. I believe they did. Okay. But there is another pending case, the Carrasco-Chavez case, in where they are arguing further, more so than Mondragon, that Moncrief affects the Mondragon decision and that case is pending. And thankfully, I did talk to the pro bono lawyers that are doing that and they certainly have more resources than me and I'm glad they're doing that. I do candidly admit that I was a fan of the mini-trial in the immigration system and I do believe that that has bit the dust. I always felt that it was important for my clients to have their day in court, especially for a client who waited almost 22 years to have his day in court, to have some opportunity to at least persuade the court that his crime was not an aggravated felony and that he was for that relief. However, I kind of believe that in Mondragon that that has really been swept away because the court specifically said, we are not endorsing mini-trials. So I would say that that second argument, because we did have an inconclusive record, my client pled guilty to manslaughter in the District of Columbia, actually specifically manslaughter while armed. He had an altercation with his then common-law wife, the mother of his child, and in the process of that altercation, the young woman, Maria Martinez, was killed. My client did plead guilty to manslaughter. However, we would argue, at least at this point in time, that it was, at least for that particular argument, that it was a divisible crime in the fact that it could have been either voluntary manslaughter or involuntary manslaughter. Our argument was that an involuntary manslaughter would not have been an aggravated felony. He would have been eligible for that relief. However, I believe that that issue has been foreclosed by Mondragon because that's how we, there was an inconclusive record. Both sides readily agree that this 1986 case from D.C., there was absolutely no records of conviction other than the fact of the conviction, which leads me to my other argument that I've proposed to this Court, which was a retroactivity argument. Certainly not the preferred argument that I had. I was much more happy doing my mini-trial argument. But anyway, there's a lot of unfairness in this case. I mean, certainly we have a tragic unfairness in that a young woman was killed. But we also have a man that, he did his time in jail, he changed his life around, he lived an otherwise peaceful life for many, many, many years, and then tried to obtain some immigration benefits under NACARA. And I will briefly, I'm going to briefly describe NACARA for the Court. NACARA is an acronym for the North, sorry, Nicaraguan and Central American Relief Act. It is a product of the ABC settlement agreement, which is the American Baptist Church's B. Thornburg. That was a settlement that was reached in 1991. In the late 80s, a number of non-profit organizations were seeing that many of their low-income clients, especially from these war-torn countries of Central America, Guatemala, El Salvador especially, were getting all of their asylum applications denied. And they actually certified a class that argued that this was an unfair application of INS law. And they actually won a settlement, and it was called the ABC, American Baptist Church's B. Thornburg, that settlement. And at that time, my client was actually in removal proceedings. He had filed an asylum application. Basically, he had been the victim of a death squad. He only escaped being killed by a death squad by jumping into a river. It was very dark at night, very late at night, and it was dark out, and he jumped into the river and managed to escape. And then he came to the United States. But during those removal proceedings, the settlement was reached. And part of that settlement was that they could then have these removal proceedings administratively closed to seek the benefits under the ABC settlement agreement. Unfortunately for my client, the benefits under the ABC agreement were very slight. One of them— Mr. Davis, I don't mean to cut you off. Yes. But you know, this really comes down to statutory interpretation, doesn't it? I'm getting there, Your Honor. Yeah, and I just need to— I mean, this is not an easy case. To me, that's the guts of the case. And while the factual background is very interesting— But it does— It doesn't help you. It really comes down to the statute, doesn't it? It does, Your Honor. But there's also elements of this that I will incorporate into that argument, the retroactivity argument, is that the part of the—had the ABC agreement said that my client could apply for NACARA, this would be a no-brainer because I would just enforce that agreement in the district court. Unfortunately, one of the few things that was granted in that was a de novo asylum adjudication. However, I think what happened is because there were so many registered applicants to the ABC agreement that they realized that they had a huge problem on their hand. And in 1996, 1997, they implemented this NACARA regulation. It was implemented in 1997, but it was made retroactive to the actual day of IRA-IRA, which was a major immigration paradigm shift in a lot of different laws, including the aggravated felony definition. So—I'm going to sum up already. But anyway, the issue is—you're right, Your Honor—the issue is what does the language of actions taken? That is written in the IRA-IRA statute. And actions taken is—we're seeing that the aggravated felony definition applies regardless of when the conviction occurred. But we're seeing that the application of that statement is only prospective only when there were actions taken. And what we're saying is, Your Honor, that there is a somewhat of a consensus among the people that actions taken means actions by the immigration judge and the BIA. And— You're asking us to go with the minority view. No, I'm not. I'm not, Your Honor. There is a minority view in the Sixth Circuit in the soccer case which says that actions taken begin when the immigration proceedings are initiated. And the other thing, too, is— You're not asking us to apply that? I would. Absolutely, Your Honor. What are you asking us to do, then? I'm sorry, Your Honor. Obviously, the soccer case would present my client with immediate relief because his removal proceedings began in 1990. What are you asking us to do? I'm asking you to follow the soccer decision. Okay. I was confused because Judge Keenan asked you about the minority view. I answered that incorrectly from my opposing side. I'm sorry, Your Honor. This is my first time in the oral argument, Your Honor. So, anyway, that—I mean, the issue is what is an action? I mean, obviously, the foremost case was—the earliest case was the Valderrama case in the Ninth Circuit. They postulated that it could be several things. Obviously, one of them was the actions of the IJ and the BIA. The next one could be the non-citizen applying for relief with— Don't you want to celebrate the Sixth Circuit? Absolutely, Your Honor. I would—I mean, because if this court says that that action—that actions taken refers to when the action began or initiated, my client could not be—my client could not have been held to have been an aggravated felon under any definition, or at least the definition at that time. The pre-IRA-IRA definition. And there's a long section as to why that is, and I could spend another 20 minutes talking about that. But it depends—there's a whole bunch of retroactivity rules that affect that. Under that pre-IRA-IRA, he would not be an aggravated felon. In fact, he wasn't. And that's what Judge Bennett ruled in his case when we took this to the District Court of Maryland. We took this case to the District Court of Maryland, and he ruled that, in fact, that he was a member of the ABC class. But, you know, you're talking about this actions taken language. I think maybe in isolation, or at least this is where I had difficulty with your argument. You're trying to extrapolate the—at least as I see it, perhaps—the actions taken language to the entire act, rather than actions taken by the section. The actions taken language says the amendments made by the section shall apply to the actions taken. So it seems that that would be then actions taken under Section 321. And if that's the case, you have a very limited subset of actions. But that would be that definition of the application of the aggravated felony definition. That's what we're talking about. That definition would not—would only reply to actions taken after, you know, after the implementation of IRA. Well, that section would address whether it was an aggravated felony. But would that section address the timing of any action by the attorney general or any action by the BIA or the immigration judge? It's just talking about 321. Absolutely, Your Honor. You're talking about 321C, and right above it is B, which is the application of the aggravated felony definition applies to—regardless of when that occurred. So if you're talking about actions taken after that, you're only—that that would only—that that definition would only apply to my client if there was an action taken. And my time is up, Your Honors. I'm—I apologize. So I don't think I've answered— You have some time reserved. Okay. Thank you. Mr. Roberts? Mr. Robbins, this is not a model of clarity. It really isn't. Are you referring to this case or— Section 321B, Section 321C. I mean— Well, may it please the Court— Why is the Fifth Circuit's analysis and the reasoning of the majority of the circuits more persuasive from your point of view in terms of the statutory interpretation? Well, just as an initial matter, may it please the Court, Jonathan Robbins here on behalf of the respondent, Eric Holder. With respect to the ambiguity with—to the term actions taken within the statute and my colleague properly noted that a majority of the circuits have held that actions taken includes actions and decisions by the immigration judge and the board. Right. And I think the Fifth Circuit gave at least the most analysis to that question. And the Third Circuit as well in— Okay. So go over for us why that's the more persuasive viewpoint on that issue. Well, both of those circuits discussed that there are all different types of actions that can be taken by the agency. And they really analyzed it. They said, well, you could get even before proceedings initiate technically, but with the filing of a notice to appear, the agency could take certain actions. So in analyzing what actions were taken, they looked as to what actions actually implicated the analysis that would require looking at whether or not something was an aggravated felony. And the agency decisions—when the agency issues a decision where it makes a specific finding with an aggravated felony seems to make the most commonplace sense. They actually talked about the different interpretations that you could make, and they figured that the actions and determinations by the agency and the board were—made the most sense. The board has also spoken of this. I know my colleague wants to sing the praises of the Sixth Circuit and wants the court to rely on the Sixth Circuit's decision in solder—in soccer, rather. But that decision is somewhat flawed because the board—excuse me, the Sixth Circuit in that case, in relying on the board's decision in matter of Truong, neglected to note that the board had said in its decision that actions taken refers—can refer to decisions made by the immigration judge and the board. And the Sixth Circuit's decision neglected to note that. So in that regard, the Sixth Circuit's decision is flawed. And so the government's position would be that the court should go with what the majority of circuits held and note that actions taken refers to those agency decisions like we have in this case. I would also note that this court's decision in Mondragon v. Holder would also seem to foreclose Petitioner's argument in this regard. Because like the Petitioner in this case, Mondragon was—his proceedings were initiated and he committed his particular offense prior to the date that's in the statute. So the argument that— Oh, but this issue wasn't presented in Mondragon. Well, they didn't specifically argue the actions taken, this ambiguity with respect to actions taken. But the facts in that case were the same. Yeah, but the legal issue wasn't presented to this court. It may not have been presented to this court, but the court did specifically cite to Section 321C of IRERA, which includes the action taken language. This court specifically cited to that. And essentially what the argument would be there is that this court could have considered a different argument and come out a different way in that case. But I mean, I'll leave it to the court's discretion to determine how strong an argument that is. But again, the facts are the same as here, and the court determined that the amended aggravated felony definition was retroactive. With the same proceedings initiated and criminal conviction preceding the date of September 30, 1996, which is in the statute. Now, with respect to the issue, the second issue in this case regarding the modified categorical approach and the divisibility of the statute, I brought to this court's that this is pending in another case before this court. Well, but we don't reach that if we don't get past statutory interpretation, do we? Are you referring to the retroactivity of? Well, yes, certainly the amended definition has to be properly applied retroactively before the court can get to modified categorical approach, yes. But with respect to that, I know my colleague waived the issue in the light of Mondragon, but I think it's important that the court know that the applicability of the Supreme Court's decision in Moncrief and its effect on Mondragon and this court's decision in Salem against Ashcroft is currently pending before this court. We appreciate that, and I especially appreciate it when counsel from the Department of Justice file 20HA letters, as you did in this case. So I really salute you on that score. Well, it's our responsibility. It doesn't always happen. It is your responsibility, but it doesn't always happen, unfortunately. With respect to Moncrief, that being said, I know that this is probably better left to the petition for a hearing when this case has been fully briefed and everything, and where I'm sure arguments will be heard. But just to give the court a little preview, I don't think Moncrief particularly applies in this case. In Moncrief, in the case in Moncrief, the alien was found removable based on an aggravated felony. That's different from the case that we have here. In this case, he wasn't found removable on the basis of an aggravated felony. The aggravated felony issue came up in the context of seeking relief from removal. And that's an important distinction because where the government, the government bears the burden of demonstrating that a petitioner is removable. So, in what the court said in Moncrief is essentially where the government has this burden and the statute is divisible, we're going to assume the lower form of conduct and it's the government's burden to demonstrate that the conduct falls within the higher form of conduct. Here, logic would seem to dictate that the reverse would be applicable. Because it's the alien's responsibility to demonstrate eligibility for removal, you would think that you would assume the higher form of conduct and it would be the alien's responsibility to demonstrate the lower form of conduct. Now, I don't think the court needs to go that far in this case because so far as Moncrief doesn't specifically overrule Mondragon or this court's decision in Salem, I don't think that, I still think Mondragon is good law and would control this case. But again, be aware that the petition is still pending in that other case and it might be prudent to await the decision in that case before making a determination in that regard. Now, Petitioner, he didn't speak about it during his oral argument, but it's in his brief. He's also made various due process arguments that his due process claims were violated. With respect to that, I would note that Mondragon, again, would seem to foreclose this issue that an alien has to have a specific property or liberty interest in order to make a due process violation. Certainly, there's no indication in this record that the immigration judge denied him a full or fair opportunity to make a due process violation. But again, I would note that Mondragon did not have the authority to present his case. I know he's also made a claim that his proceedings were delayed due to an administrative closure. I would note, as the board noted, that he specifically requested that administrative closure so that he could pursue settlement under the ABC case that my colleague talked about earlier. So, again, I guess, unless there are any specific questions with regard to retroactivity or the issue that's currently pending in the other case, I would respectfully request that either the court await the decision in that other case before making a determination as to this one, or if it determines that Moncrief doesn't apply in this case and doesn't need to go as far as it does in the other case. That I would respectfully request that the court uphold the decision of the Board of Immigration Appeals. The Sixth Circuit continues to apply its rule, correct? As far as I know, yes. But again, I would note that that decision, which relies on board precedent to the extent that it defers to the board in that case, neglects to note that the board's decision in that case specifically identified agency decisions by the immigration judge and the So, and that may explain why it's the sole court to have come out that way and the majority of the other federal courts have come out the other way. So, in the Attorney General's view, there's no person who would ever benefit from, would avoid the burden of the change in definition of aggravated felony. I don't think so, and I think that's probably consistent with what Congress intended when it made the statute retroactive in the first place. But yes, I would agree with that. Why would Congress limit it to actions taken if the Attorney General's interpretation essentially reads that out of the statute? I mean, well, to the extent that Congress... Otherwise... Congress left the statute ambiguous, as I think it's relatively clear that... The only thing that's clear is that actions taken is somewhat ambiguous in the context of the argument. But again, that's an ambiguity that's left to resolve by, left to be resolved by the board, I would suppose. And the board has specifically said that actions taken is included with immigration judge's decisions and board's decisions. Which reads it out of the statute. I thought you just impliedly agreed with my characterization. Because obviously, the board, the IJs, the boards are going to be taking actions every day from the moment the statute was enacted by Congress. Well, that's true. But again, I think that probably falls in line with Congress's intent to make the statute retroactive. I don't know that actions taken was intended to be limiting language. I think it was just... What else could it be, if it's not limiting language? Well, I'm trying to think of a circumstance under which that might be different from this case, where the context of where an aggravated felony might affect a case would affect it differently. Because here it came up in the context of eligibility for removal. Whereas, I'm trying to think of if it could come up in a preliminary part of an immigration proceedings that preceded the applicable date and then somehow fell away. But I can't think of something. You concede that this has been a single proceeding, single 20 plus year proceeding, right? Yes. Case number's the same. Everything's the same. The administrative closure had no legal effect whatsoever, correct? Again, I think that falls in line with Congress's intent. And to the extent that the Attorney General's interpretation reads out any instance where an alien might not be subject to the amended definition, that's the language of the statute and that's the interpretation of it. I don't see any basis in the statute or law that specifically would support the Sixth Amendment. I don't see any basis in the statute or law that specifically would mean proceedings initiated. In fact, in our brief, we explained there's really no basis for that, for specifically saying that it only applies to proceedings initiated. I mean, I think a common sense analysis of actions taken, like I said before, could be there's multiple actions that are taken. To limit it to, I don't even think the court has to look at whether or not proceedings initiated is an action taken by the board. I think all it has to reach is, are the agency decisions, actions taken within the meaning of the statute. I think that a common sense reading of it is that absolutely, there's certainly actions taken by the agency. I mean, I don't see any legal justification for saying that decisions by the board or immigration judge are not actions taken. I don't see how that could be reasonably argued. So the fact... Well, actions taken could be in the sense that you permanently remove someone or those kind of decisions. So you're saying actions taken really means any decision? Well, certainly, those decisions that have an effect of being final orders of removal, I would say have to be actions taken by the agency. Well, here he brought this later to try to have relief under the ADC agreement. And they basically said, no, we denied that. Yes. Your eligibility for it. Yes. Again, it goes back to Judge Davis' question. And I understand his question is that there is no protection against retroactivity at all, because there will always be some present action that really gave rise to why it got to this court. Well, that may have been Congress's intent. They should have said so. But when they did talk about that, they only talked in the context that it's retroactive as to when the offense occurred, no matter when that occurred, and then limited to just that. But then in another vein, they said, no, we're going to give some protection against retroactivity. And the protection is it has to be something that's after the action taken is some line in the sand. But you're saying that's just blowing wind. It means nothing. Well, I mean, all I can all I can really point to is that the board has said that and a majority of circuits have said that actions by the agency are actions taken to the extent that the statute that the term actions taken may broadly encompass things which make the retroactivity of the statute pretty much, you know, a given is the language of the statute itself. Maybe it's in. But maybe as the Sixth Circuit found that leads to a strain and unnatural reading of the statute. And therefore, maybe they're right, even though they may be in a minority of circuits. Sometime that minority gets it right. Well, again, I would point to the issue that in that that that decision is flawed to the specifically determined that agencies by the immigration, excuse me, decisions by the immigration judge and the board specifically were actions taken by the board. And they didn't acknowledge that in their decision. So the IJ could rule in favor of an alien. The statute is enacted. The attorney general could appeal to the board and the board could reverse the IJ and the aliens out of luck. I'm sorry, could you repeat that? I'm in other words, the alien obtains a favorable, favorable decision by the IJ. Yes. And there's an appeal to the board. Yes. After the statute is enacted. Yes. Well, that's the danger of retroactivity. I mean, technically, anybody who committed an aggravated felony is going to be subject to the retroactive effect of of a statute of even even in the face of an IJ decision predating the enactment of the statute that he's entitled to believe. So all it would take. Oh, I see what you're saying. All it would take is an appeal by the attorney general to the board and simply by virtue of the board making a decision. The board could reverse the IJ simply by saying, well, Congress has passed this new statute. Well, I'm I'm in my sum up time. You still got time. OK. Well, I don't know that specific circumstance would probably be have to be looked at by the board. I don't know. Well, I'm not sure I know what you mean by that. When you board's going to look at every you have two separate actions by the agency. One in favor of the alien, one against the alien. Right. Well, I which one which one is controlling based on the retroactivity? I think the second one would have to be controlling because as so long as Congress has determined that the retroactivity can apply, then, yes, somebody who's committed an aggravated felony is going to be subject to the retroactive terms that Congress enacts. So and yes, the board could overturn the decision of an immigration judge in that regard. Yeah. Just as they could overturn any decision by the immigration judge if they determined that the immigration judge judge's decision wasn't. But the immigration judge ruled correctly under the law, then applicable. Well, I guess I mean, that would. I mean, the timing of that would encompass a very narrow set of cases because the time with when within what the 30 days within one has the chance to appeal. I mean, that would be basically 30 days worth of cases that would be subject to what you're describing. But are you willing to concede those 30 days worth of cases? I don't know if I if I should or not. I'm just I mean, I probably shouldn't. But I would I would say that I would say that the board based on the retroactivity of the statute, the board can make a determination in line with that statute. Even if even if we were to go with the Sixth Circuit here. The attorney general would retain discretion whether to grant relief, correct? Well, yes, certainly the relief attorney general always has discretion. Well, not always. But in with with respect to Nicara relief, they certainly. Yes, that's what I mean. Withholding of a removed under the car. There's nothing we can say that will deprive the attorney, the attorney general of his discretion whether to grant relief in this case. No matter what we do. Correct. The discretionary forms of relief are barred from jurisdiction by statute. Yes, but we face that all the time. We can't. Nothing can force the attorney general to give asylum. But we can rule in this court that grant grant petitions because there's been a due process to now. But ultimately, only the attorney general can grant asylum. That's true. It is a discretionary form of relief. Oh, I'm sorry. Were you asking a question? Well, yes. But with respect to asylum, there's if the attorney, the attorney general's discretionary relief is based on a standard that is reviewed by this court, which is whether or not they established a well-founded fear on asylum. But this is a cancellation. This is cancellation. I don't think there's any doubt that I mean, in fact, this court has held that it's a discretionary form of relief that doesn't implicate a property. Are you saying this court could make damage? The attorney general has forced the attorney general to give someone asylum in any circumstance? I don't know. No, I don't think so. I don't care how much we've ruled in favor of the person. You can't we can't mandate attorney general. No, absolutely not. Period. So I see that I have eight seconds left. So I would respectfully request that the court uphold the decision of the Board of Immigration Appeals or, as I mentioned before, with respect to the pending case, possibly await that case to see how that comes out. Thank you very much. Davis, you have some time remaining. I just wanted to make a couple comments. Yes, we are. We are arguing that the Sixth Circuit, we are advocating for the Sixth Circuit interpretation of actions taken. There's also the question of what does actions taken mean? And we could also say that actions taken could also mean the inclusion in the ABC class. And that was a central part of eligibility for NACARA, as eligibility, prima facie eligibility for NACARA is based on, at least on part, there's a number of different ways to get into that. But one of them is certainly ABC class membership, actually being certified as in the ABC class. And then the, I do want to talk briefly about the, that even if this court was to go in a different direction and follow the majority and say that actions taken is, in fact, just orders and the IJ and BIA, we would also say that there was a due process issue in this case because my client originally applied for NACARA through USCIS. And he was denied through USCIS by saying that he was not a member of the ABC class. That's why we went into federal court. There's not a simple mechanism for challenging that. In fact, the only way that I know of to challenge that determination is to go into federal court, which is what we did. And Judge Bennett said that he actually adopted the SACRA opinion. And he said, and even if, even if that's not even the case, there were no actions taken by the immigration judge or the BIA at that time. What was the basis for excluding him from the class? The aggravated felony, the manslaughter conviction. I see. So, so, so, okay. And in that particular case, we actually raised a separation of powers issue that, you know, once he was a member of the ABC class under the judiciary, that Congress couldn't go back and pass a law that said that would exempt him from that. Actually, Judge Bennett and constitutional avoidance skirted that issue and just went on a statutory on the actions taken issue. But again, that decision was never appealed. It was the final decision. And we never had an opportunity to go back to USCIS and say, hey, look, you know, even if, you know, even if to apply Judge Bennett's decision, we were stuck in the immigration court and where all of a sudden there's this huge paradigm shift that now all of a sudden we've got IJs and BIA making decisions and, oh, oh, actions taken apply. So in that particular case, that's where I said that there was a due process argument in that particular case because it seems sort of arbitrary to say, why can't we go, you know, if, if, if the decision by a U.S. district court on a U.S. district court settlement and we can't, we can't, we, we have won that case and we go back to, we want to go back to USCIS and say, hey, we're, we're not, we're a member of this ABC class and we can get these NACARA benefits. We were not able to do that. And why weren't you able to do that? Because there's no mechanism to do that. They were in, they instantly referred us into the immigration court and, and then there we've got this huge paradigm shift where all of a sudden we've got actions taken by the IJ and the BIA. When did the USCIS process close down? You mean for the adjudication of the NACARA? Yeah, for the class. I believe that was 2007 or 2000, somewhere in that range around 2007, 2008, or 2009. I'm actually not sure. It's in the. And was he serving a sentence during all that time? No, your honor. He actually, when he was released in 1990, he had served about four years in D.C. Corrections and was released on parole. In fact, he was still on parole even, even up to the time that he was, he was deported two years ago. There was no way that I could keep him here during the pendency of this case because there was no reparable harm. But anyway, the, the, but I lost my train of thought, your honor. Sorry. That's okay. But anyway, that was the due process argument that, that I felt that even if this, let's say that this court says, well, we, we disagree with the Sixth Circuit. I mean, I actually think that it makes a lot of sense to say, this is the actions taken. This is when it starts. And there's no, there's no paradigm shifts just because the law changed in the, in this particular, in this particular case. And then the other thing is that we weren't even before the IJ or the BIA, you know, if this court adopts the majority view. We were before the agency and most of the opinions have, have not said that that is an action taken under, under IRA, IRA 322, 321C. So that's where we feel that we have the, the unfairness. That here was a person who was a member, a certified member of a, of a, of a settlement class in the U.S. District Court in California. He went to apply for the benefits that were implemented by Congress to take advantage of those benefits, that ABC NACAR was implemented to take advantage of those benefits. And then he went and applied to USCIS to take advantage of those benefits. And he was said, no, and because you have an aggravated felony, you're not eligible. We went into the district court. They said, you are eligible. You do have, you do are a member of the ABC class. You can take advantage of these benefits. However, we were never able to do that. We were thrust into the immigration court where we got a paradigm shift. We got the paradigm shift under the majority view that this is now actions taken, you know, by the IJ and the, by the IJ and the BIA. So essentially, again, our position is we believe that actions taken should be for when the proceeding started. In our case, it would be 1990, and that the pre-IRA-IRA law should apply to my client and not the definition of IRA-IRA of the aggravated felony. It should apply the pre-IRA of the aggravated felony definition of pre-IRA-IRA should apply to my client. Under those definitions, under the laws of pre-IRA-IRA, my client was not an aggravated felon, and that he could apply for this relief. Other than that, I'm almost out of time. And I'll ask your honors to, of course, keep in mind that the other case is pending for that other argument. We actually think that's a stronger argument. But also, in this particular case, we ask that you reverse the board decision. Thank you, your honors. Thank you very much. All right. We're going to come down to Greek Council and proceed to our final case for today. Thank you.
judges: Roger L. Gregory, Andre M. Davis, Barbara Milano Keenan